**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | Criminal Case No. 12-125 (CKK) |
| | : | |
| **JOSE AMAYA-ORTIZ,** | : | |
|         **Defendant.** | : | |

**GOVERNMENTS MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, submits this Memorandum to assist the Court in determining an appropriate sentence in this case. The Government submits that a sentence of twelve years and six months of incarceration followed by five years of supervised release, to which the parties agreed in this case pursuant to Fed. R. Crim. Pro. 11 (c) (1) (C), would adequately serve the interest of justice as codified in 18 U.S.C. § 3553 (a). The Government urges the Court to accept the defendant's plea of guilty and sentence the defendant to a period of incarceration of twelve years and six months to be followed by five years of supervised release.

**I.    THE PLEA AGREEMENT**

On November 14, 2013, the Defendant pled guilty to Count One of the Superseding Indictment charging him with Conspiracy to Distribute and Possess with Intent to Distribute Five Kilograms or More of Cocaine in violation of 21 United States Code, §§ 846, 841(a)(1) and 841(b)(1)(A). The defendant signed an agreement pursuant to the provisions of Fed R. Crim. Pro. 11 (c) (1) (C), and the parties agreed to request a sentence of twelve years and six months incarceration followed by five years of supervised release.

1

Pursuant to Rule 11 (c) (1) (C), the Court may accept or reject the agreement, and may defer a decision until the Court has reviewed the pre-sentence report.  Once the Court accepts a plea pursuant to this section, the recommendation or request for a specific sentence by the parties in such an agreement binds the Court.

## II.  FACTUAL PROFFER

### A.  OVERVIEW

The FBI and MPD initiated this investigation in August 2011, when intelligence was developed regarding a cocaine and cocaine base distributor named JAY ISAACS in the District of Columbia.  The investigation determined that ISAACS' drugs involved were primarily supplied by ANTHONY JONES.  Subsequent investigation determined that JONES was primarily supplied with cocaine by HENRY MOISES GOMEZ LOPEZ (hereinafter referred to as "GOMEZ"), which JONES thereafter trafficked to several other customers.  Investigation determined GOMEZ and his associate WALTER DAVID AVALOS LOPEZ (hereinafter referred to as "AVALOS") were supplied with cocaine by DANIEL ZINTURA-FLORES (hereinafter referred to as "ZINTURA").  Investigation of ZINTURA determined that ZINTURA, with the assistance of his son, DANIEL ZINTURA, Jr., transported multiple-kilogram quantities of cocaine from southern Texas to the Washington Metropolitan Area.  ZINTURA was supplied with this cocaine by the defendant, JOSE A. AMAYA-ORTIZ, also known as "CUATE" (hereinafter referred to as "AMAYA" or "the defendant").  ZINTURA was assisted in transporting cocaine by two couriers, ANDREW SLAVINSKI and SUNNY JO SCHWINN.  ZINTURA was also assisted in cocaine distribution by his girlfriend MARIA GAYTAN, who arranged to distribute cocaine to her relatives, CARLOS GAYTAN and ALICIA GAYTAN.  The defendant supplied large quantities of cocaine to this conspiracy, and was

responsible for overseeing the shipment of at least fifty kilograms of cocaine from Texas to the Washington, D.C. area.

B. THE INVESTIGATION AND COURT-AUTHORIZED WIRETAPPING

Based upon controlled purchases of cocaine in Washington, D.C. from JAY ISAACS in the last half of 2011 and on additional investigation, the FBI in conjunction with the U.S. Attorney's Office for the District of Columbia applied for a wiretap on ISAACS' phone. Based on this and later applications, beginning in November 2011 the Honorable Judge Emmet G. Sullivan, U.S. District Court, District of Columbia, signed successive orders authorizing the interception of wire communications and in some instances electronic communications (text messages) to and from cellular telephones used by ISAACS, JONES (two orders allowing two thirty-day periods of interception), GOMEZ and ZINTURA.

C. THE ZINTURA INVESTIGATION AND THE DEFENDANT'S ROLE IN THE CONSPIRACY

Evidence shows that between August 2011 and May 2012, DANIEL ZINTURA-FLORES traveled to Texas on multiple occasions for the purpose of obtaining cocaine to transport back to the Washington, D.C. area. ANDREW SLAVINSKI and SUNNY JO SCHWINN also made these journeys, at ZINTURA's request, so as to be available to drive the drugs back from Texas in a Dodge Durango which had a secret compartment, inside of which the cocaine would be stowed for transport. During these trips, SCHWINN and SLAVINSKI drove the Durango, and the defendant and ZINTURA and sometimes others drove in a different vehicle, keeping in touch with the couple in the Durango by phone. Upon arrival in Texas, the defendant took possession of the Dodge Durango, made arrangements for cocaine to be stowed in the secret compartment and returned the truck to SLAVINSKI and SCHWINN for the drive back to the Washington, D.C. area. The defendant stayed at a motel in the Washington, D.C.

3

area while ZINTURA sold the cocaine, then followed the Durango, now loaded with the cash payment for the cocaine, back to Texas.  Over the course of the conspiracy, the defendant and ZINTURA or people working for him made several such trips to and from Texas for the purpose of transporting narcotics and money.

Among other specifics, at trial, the government would present evidence that in the first half of May 2012,  ZINTURA, Jr., who is ZINTURA's son, and the defendant, AMAYA, who is also known as "Cuate," traveled to Texas for the purpose of obtaining cocaine. Shortly thereafter in Texas, the cocaine was obtained through the defendant's connection, and ZINTURA, Jr. and AMAYA-ORTIZ followed SCHWINN and SLAVINSKI at a distance as they drove the Dodge Durango, laden with cocaine, back to the Washington, D.C. area.  On May 15, 2012, at approximately 2:48 a.m., SCHWINN and SLAVINSKI, driving the white Dodge Durango, arrived at ZINTURA's residence. ZINTURA was observed meeting with the couriers in front of the home.  The couriers left the Durango with ZINTURA, and drove out of the area in ZINTURA's red SUV.  The defendant supervised the couriers and ZINTURA, Jr. during the course of this trip and the others made to Texas.  He made the necessary arrangements to procure the cocaine, took possession of the Durango so that cocaine could be loaded into the secret compartment behind the left rear wheel well, and alerted the group as to when they would leave Texas to return to the Washington, D.C. area.  Between August 2011 and May 23, 2012, AMAYA supervised at least five such shipments, each involving approximately ten kilograms of cocaine, totaling at least 50 kilograms of cocaine.

**SENTENCING CALCULATION**

A. STATUORY MAXIMUMS

The penalty for conspiring to commit a narcotics offense in violation of 21 United States Code, §§ 846, 841(a) (1) and 841(b) (1) (A) is the same as that prescribed for the substantive offense, "the commission of which was the object of the … conspiracy." The statutory minimum penalty includes a sentence of not less than ten years imprisonment, the maximum penalty is a sentence of life imprisonment, a fine not exceeding $10,000,000 and a term of supervised release of 5 years.

B. GOVERNMENT'S SENTENCING GUIDELINES CALCULATION

The United States Sentencing Commission, Guidelines Manual, ("U.S.S.G." or "Sentencing Guidelines") calculation in the Presentence Report (PSR) places the defendant's base offense level at 36. See PSR ¶ 71. An offense involving conspiracy to distribute and possess with intent to distribute fifty kilograms but less than 150 kilograms of cocaine has a base offense level of 36. *Id*. The Parties agree that the defendant's involvement in the conspiracy was that of a manager or supervisor pursuant to USSG § 3B 1.1 (c), resulting in a two-level enhancement. See PSR ¶ 74. Moreover, the parties agree that a total three level reduction for the defendant's acceptance of responsibility is appropriate pursuant to § 3E1.1 of the Sentencing Guidelines. See PSR ¶¶78, 79. The PSR acknowledges the defendant does not have any criminal history points and therefore his criminal history category is I. See PSR ¶ 84. The Government calculates the defendant's final offense level to be 35, which in conjunction with criminal history category I, results in a Sentencing Guidelines range of 168-210 months incarceration, with a ten-year mandatory minimum sentence. See PSR ¶ 125.

## SENTENCING RECOMMENDATION

.         The government recommends that the Court accept the defendant's plea and impose a term of imprisonment of twelve years and six months incarceration to be followed by five years of supervised release. This recommendation is made after consideration of the sentencing factors enumerated in 18 U.S.C. § 3553(a) and the guidelines and policies promulgated by the United States Sentencing Commission, as well as the nature and circumstances of the defendant's criminal actions in this case and his pre-trial acceptance of responsibility.

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 128 S. Ct. 586, 594 (2007). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark." Id. at 594-96.

Next, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). Id. at 596. The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a). *United States v. Rita*, 127 S. Ct. 2456, 2463-65 (2007). The §3553(a) factors include  (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment, (3) the Sentencing Guidelines and related Sentencing Commission policy statements, and (4) the need to avoid unwarranted sentence disparities.

Here, the negotiated sentence of twelve years and six months of incarceration is an appropriate and reasonable outcome in consideration of the factors to be weighed by the Court pursuant to 18 U.S.C. 3553(a). The lengthy sentence reflects the seriousness of the offense as the defendant admitted he coordinated and supervised the trafficking of at least 50 kilograms of cocaine from Texas into the Washington D.C. area. Imposition of this sentence also serves as a deterrent to the defendant and others considering committing a similar crime in the future.

Additionally, the Court's acceptance of this plea agreement benefits both the Defendant and the Government. The defendant benefits from this agreement as the agreed upon sentence, which is reasonable in light of the offense, is less than the sentencing range he would be exposed to if he were convicted at trial. This plea benefits the Government as it ensures the defendant will receive a sentence it believes is appropriate under the circumstances of the defendant's plea, while eliminating the expense and uncertainty associated with conducting a trial.

Finally, the circumstances of this plea agreement justify the twelve year and six month sentence. The defendant oversaw the trafficking of at least fifty kilograms of cocaine, a drug which the Courts and legislature recognize as a serious threat to our society. The defendant played a vital role in this conspiracy as he arranged the purchases of cocaine, took possession of the Durango while the cocaine was concealed in the vehicle's secret compartment, and supervised the transportation of the drugs and cash during trips between Texas and the Washington D.C. area. Based upon his role the defendant faced a minimum of 168 months of incarceration under the Sentencing Guidelines absent the agreed upon sentence. A lack of prior convictions and the defendant's willingness to accept responsibility by timely expressing his intention to plead guilty led the Government to offer him a sentence of twelve years and six months incarceration – 150 months – if accepted by the court. Such a sentence, in conjunction

with a five-year period of supervised release and the defendant's forfeiture of assets, meets the sentencing goals of fairness, punishment and deterrence, and is therefore a justified departure from the sentencing guidelines.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this honorable Court accept the defendant's plea and sentence the defendant to a period of twelve years and six months incarceration to be followed by five years of supervised release, in addition to forfeiture of assets.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney
Bar No. 447889

By: _____-*s*-_____
THOMAS A. GILLICE
Assistant United States Attorney
D.C. Bar No. 452336
555 4TH Street, NW
Washington, DC 20530
202-252-1791
thomas.gillice@usdoj.gov